**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **MARGARET FLINT,** | § | |
| **PLAINTIFF,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:04-CV-659-A** |
| | § | |
| **JO ANNE B. BARNHART,** | § | |
| **COMMISSIONER OF SOCIAL SECURITY,** | § | |
| **DEFENDANT.** | § | |

**FINDINGS, CONCLUSIONS AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**
**AND**
**NOTICE AND ORDER**

This case was referred to the United States Magistrate Judge pursuant to the provisions of

Title 28, United States Code, Section 636(b).  The Findings, Conclusions and Recommendation of

the United States Magistrate Judge are as follows:

FINDINGS AND CONCLUSIONS

A.    STATEMENT OF THE CASE

Plaintiff Margaret Flint brings this action pursuant to Section 405(g) of the Social Security

Act, Title 42 of the United States Code, for judicial review of a final decision of the Commissioner

of Social Security denying her claim for disability insurance benefits under Title II of the Social

Security Act.  Flint applied for disability benefits on July 11, 2001, claiming disability as of

February 1, 2001 due to chronic fatigue, vertigo, neck and shoulder pain, nausea, and Crohn's

disease. (Tr. 43, 81).  She meets the requirements for insured status through at least 2006. (Tr. 41).

**Findings, Conclusions and Recommendation of**
**the United States Magistrate Judge–Page 1**

After the Social Security Administration denied Flint's application for benefits both initially and on reconsideration, Flint requested a hearing before an administrative law judge (the "ALJ"), and ALJ William H. Helsper held a hearing on February 20, 2003 in Fort Worth, Texas.  (Tr. 414). Flint was represented by counsel.  On April 7, 2003, the ALJ issued a decision that Flint was not disabled because she retained the residual functional capacity (RFC) for a modified range of sedentary work, which did not preclude her from performing her past relevant work as a data entry clerk. (Tr. 22-30).   The Appeals Council denied Flint's request for review of his case, leaving the ALJ's decision to stand as the final decision of the Commissioner.  (Tr. 5).

B.  STANDARD OF REVIEW

The Social Security Act defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity.  42 U.S.C. § 423(d)(1)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed.  20 C.F.R. § 404.1520. First, the claimant must not be presently working at any substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. § 404.1527.  Second, the claimant must have an impairment or combination of impairments that is severe. 20 C.F.R. § 404.1520(c). At the third step, disability will be found if claimant's impairment or combination of impairments meets or equals an impairment listed in the appendix to the regulations.  *Id.* § 404.1520(d). Fourth, if disability cannot be found on the basis of claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work.

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge**–Page 2

*Id.* § 404.1520(e).  And fifth, the impairment must prevent the claimant from doing any  work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* § 404.1520(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999).

At steps one through four, the claimant has the burden of proof to show he is disabled. If the claimant satisfies this responsibility, the burden shifts to the Commissioner at step five of the process to show that there is other gainful employment the claimant is capable of performing in spite of his impairments. *Crowley,* 197 F.3d at 198.  If the Commissioner meets this burden, the claimant must prove that he cannot in fact perform the work suggested. *Waters v. Barnhart,* 276 F.3d 716, 718 (5th Cir. 2002).  A finding at any point in the process that a claimant is disabled or not disabled is conclusive and terminates the analysis.  *Masterson v. Barnhart,* 309 F.3d 267, 272 (5th Cir. 2002).

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole.  *Leggett v. Chater,* 67 F.3d 558, 564 (5th Cir. 1995);  *Hollis v. Bowen,* 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.*  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* Conflicts in the evidence are for the Commissioner and not the court to resolve.  *Masterson,* 309 F.3d at 272.  The court will not re-weigh the evidence, try the questions *de novo,* or substitute its judgment for the Commissioner's, even if the court believes the evidence weighs against the Commissioner's decision. *Id.*; *Harris v. Apfel,* 209 F.3d 413, 417 (5th Cir.2000);  *Hollis,* 837 F.2d

**Findings, Conclusions and Recommendation of**
**the United States Magistrate Judge**–Page 3

at 1383.

C.     ISSUES

   1.     Whether the RFC assessment is supported by substantial evidence and in accordance

          with applicable legal standards.

   2.     Whether the ALJ should have found Flint entitled to a closed period of disability.

   3.     Whether the ALJ's determination that Flint could perform her past relevant work is

          supported by substantial evidence.

D.     ADMINISTRATIVE RECORD

   1.     Medical History

The ALJ provided the following summary of Flint's medical history:

The record shows that the claimant has a history of Crohn's disease[1] and must wear
an ileostomy bag following a bowel resection. She was, however, generally in good
health until August 2000, when she began complaining of a headache associated with
nausea, ocular fatigue and right arm pain. Upon examination, she had some
nystagmus and was diagnosed with cervical radiculopathy[2] for which a short course
of steroids were prescribed. An exercise stress test performed in October showed no
signs of ischemia after 6½ minutes, and the claimant was cleared to return to work.
However, she returned to her treating physician in January 2001 with renewed
complaints of neck and right shoulder pain with numbness radiating into her lower
arm and fingers. She was again diagnosed with cervical radiculopathy and given a
short course of steroids. In addition, a cervical MRI was performed and this revealed
degenerative changes at multiple levels. An angiogram of the major intracranial
arteries was also performed in an effort to determine the cause of the claimant's
headaches, but this showed no abnormalities (Exhibit 1F).

---

   [1] Crohn's disease is a chronic inflammatory disease of unknown etiology, involving any part of the
gastrointestinal tract from mouth to anus, but commonly involving the terminal ileum with scarring and thickening of
the bowel wall; it frequently leads to intestinal obstruction and fistula and abscess formation and has a high rate of
recurrence after treatment. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 514 (29th ed. 2000).

   [2] Radiculopathy refers to disease of the nerve roots.  *Id.* at 1511.

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge–Page 4**

On February 1, 2001, the claimant was seen by a neurologist who noted that the MRI showed no evidence of nerve root compression and that she was neurologically intact despite her complaints of neck pain. Nerve conduction tests subsequently confirmed that there was no peripheral nerve compression or radiculopathy, and in April, the claimant reported that the use of an antidepressant medication had resulted in improved right upper extremity and neck pain. She also reported that her vertigo had resolved after a couple of weeks. However, she returned to the neurologist in May with renewed complaints of shoulder pain (this time on the left side, resulting from a fall), dizziness and fatigue. The neurologist concluded that the dizziness was the result of benign paroxysmal positional vertigo[3] and referred her to a vestibular rehabilitation program. In addition, she was advised to seek treatment for the shoulder pain through her primary care physician (Exhibit 2F).

The claimant returned to her family doctor in May 2001 and was diagnosed with a partial acromioclavicular[4] separation on the left. Pain medication and range of motion exercises were recommended (Exhibit 1F), but the claimant continued to report pain and was referred to an orthopedic surgeon in July. This doctor diagnosed left shoulder impingement syndrome[5] and recommended a subacromial injection, along with additional exercises (Exhibit 3F). During this period, the claimant was also diagnosed with thyroid goiter (Exhibit 1F), and in August, she underwent a biopsy of the mass which revealed no significant disease process (Exhibit 6F). Her treating neurologist subsequently reported that chronic pain was causing increasing fatigue, opining that the claimant was unable to work at that time (Exhibit 2F). In addition, the orthopedic surgeon noted little improvement in the claimant's shoulder pain following her injection, and a MRI revealed a rotator cuff tear. On September 4, 2001, the claimant underwent arthroscopic surgery to repair the left shoulder rotator cuff tear, as well as a subacromial decompression. Within a few weeks, she reported significant improvement in her left shoulder pain (Exhibit 3F).

---

[3] Benign paroxysmal positional vertigo is a recurrent positional vertigo and nystagmus occurring when the head is placed in certain positions such as with one ear down, and relieved by returning to an upright position. *Id*. at 1959.

[4] Acromioclavicular refers to the area of the acromion and clavicle, especially to the articulation between the acromion and clavicle. The acromion is the lateral extension of the spine of the scapula, projecting over the shoulder joint and forming the highest point of the shoulder. *Id*. at 21.

[5] Impingement syndrome refers to the progressive pathologic changes resulting from mechanical encroachment of the acromion, coracoacromial ligament, coracoid process, or acromioclavicular joint on the rotator cuff. *Id*. at 1758.

**Findings, Conclusions and Recommendation of the United States Magistrate Judge**–Page 5

The claimant had no complaints about her left shoulder and was reportedly doing "quite well" upon follow-up examination by her orthopedic surgeon in late October 2001 (Exhibit 11F). The following month, she was noted to have a recurrent thyroid nodule, as well as ongoing complaints of dizziness when she turned her head to the right (Exhibit 6F). A cervical epidural steroid injection was administered in November (Exhibit 8F), and the claimant also advised her gastroenterologist that month that medication had brought about marked improvement in the symptoms of her Crohn's disease after her use of nonsteroidal anti-inflammatory pain medication had aggravated her condition (Exhibit 7F). By early December, the claimant reported that her left shoulder was "essentially back to normal" other than some "slight weakness," but she complained of new symptoms involving her right shoulder and left hip just as the orthopedic surgeon released her from ongoing care after her arthroscopic surgery (Exhibit 11F). A couple of days later, she underwent a right thyroid lobectomy without complications (Exhibit 9F).

The claimant returned to the orthopedic surgeon about a week later with a new referral to evaluate her right shoulder and left hip, and was diagnosed with right shoulder impingement syndrome and left hip trochanteric bursitis[6] for which conservative measures (including injections and physical therapy) were initiated (Exhibit 11F). A MRI subsequently revealed a rotator cuff tear in the right shoulder (Exhibit 3F), and in January 2002, surgery was recommended to repair this. In addition, the orthopedic surgeon injected the left hip again as the first injection had provided significant pain relief (Exhibit 11F). I note that her gastroenterologist also reported in January that she had no signs of active Crohn's disease (Exhibit 7F). On March 5, the claimant underwent arthroscopic surgery to repair the right shoulder rotator cuff tear and to perform a partial synovectomy[7] and subacromial decompression (Exhibit 14F). Within about a week, she reported improvement in her symptoms other than a little bit of numbness in 2 fingers which her surgeon attributed to post-operative swelling. The following month, she had improved enough to begin physical therapy and, by early May, was reportedly "doing quite well" and "making good progress" (Exhibit 11F).

Subsequently, the claimant was seen in mid-March by a physician's assistant who noted complaints of swelling in the hands associated with motor weakness. Upon examination, no edema was noted in the extremities but unspecified motor strength

---

[6] Trochanteric bursitis is inflammation of a trochanteric bursa with pain on the lateral part of the hip and thigh. *Id.* at 257. Trochanter refers to the processes below the neck of the femur. *Id.* at 1881.

[7] A synovectomy is the excision of a synovial membrane, as of that lining the capsule of the knee joint, performed in treatment of rheumatoid arthritis of the knee, or of the synovial sheath of a tendon. *Id.* at 1773

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge–Page 6**

deficits were attributed to pain. The physician's assistant diagnosed edema and arthralgias and got permission from the claimant's primary care physician to dispense a short course of steroid treatment. The claimant returned a week later to report to her doctor that the steroids had resolved her symptoms. She also expressed concern at that time that she may have some form of lupus. The primary care physician noted normal blood tests but nonetheless speculated that she probably had "a nonspecific autoimmune disease", and prescribed more steroids (Exhibit 19F).

By early June 2002, the claimant had achieved her goals in physical therapy and was discharged to continue home exercises of her right shoulder (Exhibit 12F). The following month, she was seen by a rheumatologist to evaluate her complaints of fatigue, hidradenitis[8] (which had reportedly been diagnosed by a dermatologist), and joint pain, swelling and stiffness. X-rays showed cervical degenerative disk disease, no abnormality in the hands other than slight periarticular osteopenia,[9] and no degeneration in the feet, but the presence of bilateral inferior calcaneal spurs. Bone density testing also revealed osteopenia and laboratory tests were negative for any connective tissue disease. The claimant was diagnosed with osteoarthritis for which she was given pain medication, and she was advised to take a calcium supplement for her osteopenia (Exhibit 21F).

In August 2002, an endocrinologist reported that the claimant had secondary hyperparathyroidism and hyperaldosteronism,[10] most likely secondary to her ileostomy, as well as a weight gain associated with hyperinsulinemia[11] (Exhibit 20F). However, the record fails to reflect significant symptoms or functional limitations associated with any of these conditions or with the claimant's osteopenia, hidradenitis and history of thyroid lobectomy. I therefore find that these are non-severe impairments under the Act. Bowen v. Yuckert,482 U.S. 137 (1987); Stone v. Heckler,752 F.2d 1099 (5th Cir. 1985). SSR 96-3p.

Subsequent medical reports show that, in mid-September 2002, the claimant's

---

[8]  Hidradenitis is the inflammation of a sweat gland. *Id*. at 822.

[9]  Osteopenia is reduced bone mass due to a decrease in the rate of osteoid synthesis to a level insufficient to compensate normal bone lysis. The term is also used to refer to any decrease in bone mass below the normal. *Id*. at 1289.

[10]  Hyperparathyroidism is a condition caused by excessive levels of the parathyroid hormone. *Id*. at 854. Hyperaldosteronism is an abnormal increase of the hormone aldosterone in the blood. *Id*. at 848.

[11]  Hyperinsulinemia is an excessive secretion of insulin by the pancreatic islets, resulting in hypoglycemia or a diminished concentration of glucose in the blood. *Id*. at 851, 863.

**Findings, Conclusions and Recommendation of**
**the United States Magistrate Judge–Page 7**

rheumatologist noted only "stable chronic changes with discomfort in the hands, feet and knees." A change was made in her pain medication but her diagnoses remained the same; i.e., osteoarthritis and osteopenia (Exhibit 21F). She was treated by her family physician for cystitis in October (Exhibit 24F), and her rheumatologist stated that month that she was "stable and doing well," with no new complaints and improved discomfort in the hands, feet and knees (Exhibit 26F). A gastroenterology consult in November showed that her Crohn's disease remained in clinical remission and that she was appropriately compensated and well nourished (with a weight of 187 pounds), which indicated that she did not have a significant malabsorption problem despite her elevated aldosterone and parathyroid hormone levels (Exhibit 25F). When she returned to her rheumatologist for routine follow-up in December, the claimant again indicated that she was "feeling well overall," and she was noted to have good range of motion with no active synovitis in any joint despite her subjective complaints of discomfort in the hands and feet (Exhibit 26F).

(Tr. 26)(footnotes added).

Flint's primary care physician, James Anderson, M.D., completed a medical source statement on December 16, 2002 at the request of Flint's counsel. (Tr. 381-82). Anderson indicated that Flint could stand or walk for fifteen minutes at a time for a total of one hour during an eight-hour work day; sit for thirty minutes at a time for a total of three hours during the work day; rest for thirty minutes during the day; and lift up to five pounds frequently and twenty pounds occasionally. (Tr. 381-82). Anderson also stated that Flint was able to use her hands and arms on a frequent basis for reaching, grasping, and fingering. (Tr. 382). Anderson stated that his assessment was based on a diagnosis of polymyalgia rheumatica.

Anderson completed a second medical source statement on January 31, 2003 after Flint's counsel pointed out that his assessment did not total eight hours (to represent an average work day). Anderson reported that Flint could stand for fifteen minutes at a time, not to exceed a total of two hours during the work day; sit for less than fifteen minutes at a time, for a total of two hours during

the work day; and rest for a total of four hours during the work day.  (Tr .398).  He also reported that Flint could lift up to ten pounds occasionally, but could rarely or never perform tasks requiring forward or backward flexion of the neck or neck rotation to either side.  (Tr .399).  Anderson also reported that Flint could occasionally perform reaching, handling, or fingering tasks.  Anderson opined that Flint should avoid moving machinery, heights, fumes, and dust, and should never balance, crawl, bend, stoop, kneel, or climb.  Anderson based his findings on diagnoses of fibromyalgia and polymyalgia rheumatica.  (Tr. 400).

2.      Administrative Hearing

Flint was fifty-years old on the date of the administrative hearing.  She completed high school and was most recently employed as a marketing assistance until January 2001.  (Tr. 417).  Flint testified that she quit working because of pain, dizziness, fatigue, and problems with concentration  and forgetfulness.  (Tr. 418).

Flint testified that she did light housework during the day, took her medicine, and rested in the afternoon.  She was able to sit for short periods, but had to change positions after about fifteen minutes due to pain.  (Tr. 418).  The pain radiated from her neck into her arms, low back, left hip, hands and feet.  (Tr. 419).  At the time of the administrative hearing, Flint was not participating in any physical therapy program.

Flint is right-handed, and she previously did a significant amount of computer data entry work; however, she testified that using a computer gives her neck pain and causes a burning sensation that radiates into her arms.  (Tr .421-22).  She testified that she does not sleep well, but her appetite was fine unless she was feeling dizzy and nauseous.  Flint was able to drive short

distances.  (Tr. 423).

Flint testified that she had undergone thyroid surgery, but her thyroid was now functioning well and she did not need medication for her condition.  (Tr. 425).  Flint also testified that she had good use of her left arm following shoulder surgery, but she could not reach overhead or stretch with her right arm because of pain.  (Tr. 426-27).  She continued to follow a home exercise program for her neck and shoulders.  Flint also testified that she had episodes of dizziness, especially if she moved her head too fast or was exposed to too much light.  She used medication to alleviate her dizziness, but the medication was causing severe headaches.  She had recently left a message for her doctor to contact her about this problem.  (Tr. 429-30).  Flint testified that she napped for one or two hours each day because of fatigue and pain.  (Tr. 430).

Vocational expert Barbara Dunlap also testified at the hearing.  She classified Flint's previous work as a data entry clerk and marketing assistant as sedentary, semi-skilled to skilled work activity.  (Tr. 433-34).  Dunlap testified that these jobs would also allow a worker the freedom to occasionally change positions from sitting to standing.  (Tr. 434).  Dunlap also testified that secretarial and data entry work required frequent handling and constant fingering.  (Tr. 434-435).

3.      ALJ Decision

The ALJ found that Flint had not engaged in substantial gainful activity since her alleged onset date and had the following severe impairments: degenerative disk disease, osteoarthritis, history of bilateral shoulder surgery to repair torn rotator cuffs, history of Crohn's disease status post ileostomy, benign paroxysmal positional vertigo, and history of left hip trochanteric bursitis.  (Tr. 23).    The ALJ found that Flint's osteopenia, thyroid goiter, hyperparathyroidism,

hyperaldosteronism, hyperinsulinemia, and history of thyroid lobectomy were not severe impairments for disability purposes.  (Tr. 23).  The ALJ also found that Flint had no impairments meeting or equaling a listed impairment.

The ALJ considered Flint's testimony, but found her allegations not credible to the extent she alleged an inability to engage in any work activity.  Instead, the ALJ found that Flint retained the functional capacity for sedentary work that could be performed in either a sitting or standing position at the worker's option.  (Tr. 29).  The ALJ found that Flint's past relevant work as a data entry clerk, as customarily performed in the national economy, was compatible with her current residual functional capacity.  (Tr. 29).  Accordingly, the ALJ held that Flint was not disabled or eligible for benefits because of her ability to perform her past relevant work.  (Tr. 30).

E.      DISCUSSION

1.      Residual Functional Capacity Assessment

Flint asserts that the ALJ committed multiple violations of the applicable legal standards, which caused him to overstate her residual functional capacity (RFC).

a.      Treating Source Opinion

Flint asserts that the ALJ rejected Anderson's medical source statements without properly applying  the rules used in weighing treating source opinions, and that the error is prejudicial because Anderson's opinion established that she is incapable of sustained work activity at any exertional level.

Opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's impairments, treatment, and response should be given great weight in determining

disability.  *See  Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995);  *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994).  The Commissioner assigns controlling weight to the opinion of a treating physician if well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record.  20 C.F.R. § 404.1527; *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995).

Even if a treating source opinion is not entitled to controlling weight under the regulations, that does not mean the opinion should be completely rejected.  In many cases, the opinion may be entitled to the greatest weight and should be adopted even if it does not satisfy the test for controlling weight.  SOCIAL SECURITY RULING 96-2p.  However, the determination of disability always remains the province of the ALJ, and the ALJ can decrease the weight assigned to a treating physician's opinion for good cause, which includes disregarding statements that are brief and conclusory, unsupported by acceptable diagnostic techniques, or otherwise unsupported by the evidence.  *See* 20 C.F.R. § 404.1527(e);  *Leggett*, 67 F.3d at 564; *Greenspan*, 38 F.3d at 237.  Absent competing firsthand evidence, the ALJ must consider the following factors before rejecting a treating source opinion: the length of the treatment relationship, frequency of examination, nature and extent of the treating relationship, evidence supporting the opinions, the consistency of those opinions, and medical specialization.  *See* 20 C.F.R. § 404.1527(d); *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000).  *See also* SOCIAL SECURITY RULING 96-2p, 96-5p.  The ALJ will also consider any other relevant factors that tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d)(6).

Flint argues that Anderson, as her primary care physician, was the gatekeeper for all of her medical complaints and was knowledgeable about all of the limitations imposed by her various

medical conditions.[12]   Flint notes that the ALJ had not arranged for a consultative examination or obtained the services of a medical expert to provide insight into her condition, and complains that the ALJ relied on his own unqualified medical judgments.

Although the ALJ did not specifically refer to 20 C.F.R. § 404.1527(d), the ALJ acknowledged that he must consider Social Security Ruling 96-2p in evaluating treating source opinions.  Ruling 96-2p addresses when to give controlling weight to a treating source opinion and provides that opinions that are not entitled to controlling weight must still be weighed in accordance with the factors outlined in 20 C.F.R. § 404.1527.  SOCIAL SECURITY RULING 96-2p.  The ALJ's decision reflects that the ALJ had an adequate understanding of the legal framework to be used in weighing Anderson's opinions.

The ALJ reviewed both of the medical source statements that Anderson provided, but declined to give controlling weight to Anderson's opinions.  (Tr. 26-27).  The ALJ found that there were no objective findings to support the diagnoses of polymyalgia rheumatica or fibromyalgia that Anderson relied on for his opinions. (Tr. 27).  The ALJ noted that Flint's rheumatologist had diagnosed osteoarthritis and osteopenia, but had not diagnosed a connective tissue disorder.  The ALJ also noted that the sitting, standing/walking, and weight restrictions that Anderson imposed in his first statement conflicted with the opinions in the second statement he completed six weeks later, and further appeared to be based on Flint's subjective complaints instead of objective evaluation.

---

[12]  Flint also asserts that at least one treating specialist, neurologist Cherie O'Brien, M.D., opined in August 2001 that Flint was unable to work.  (Tr. 24, 142).  However, the Commissioner does not give any special significance to treating source opinions on issues reserved to the Commissioner, i.e., opinions that a claimant is disabled or unable to work.  20 C.F.R § 404.1527(e).

(Tr. 27).  The ALJ also observed that Flint had experienced significant improvement in her condition with treatment.  (Tr. 27).  The ALJ adequately explained his reasons for not assigning controlling weight to Anderson's opinions.

Flint asserts that the ALJ should have recontacted Anderson if he needed clarification of the basis for the physician's opinions.  The ALJ has a duty to develop the facts fully and fairly, and if he does not satisfy this duty, his decision is not substantially justified.  *Newton v. Apfel,* 209 F.3d 448, 458 (5th Cir.2000); *Ripley v. Chater,* 67 F.3d 552, 557 (5th Cir.1995).  If necessary, the ALJ should recontact a treating physician to  resolve any doubts or gaps in the record.  *Newton*, 209 F.3d at 457-58.  *See also* 20 C.F.R. §404.1512(e).  However, the ALJ did not indicate that the record was insufficient or that there were unresolved areas needing further development before a decision could be rendered.

Moreover, the ALJ's failure to request additional information from treating or examining sources is reversible error only if prejudicial.  The claimant must establish prejudice by showing that, if the ALJ had developed the record, additional evidence would have been produced that might have led to a different decision.  *Newton*, 209 F.3d at 458.  Flint has not demonstrated that recontacting Anderson would have produced additional evidence material to the issue of her disability.  Without a showing of prejudice, there is no basis for disturbing the ALJ's assessment of the medical source statements.

        b.        Obesity

Flint complains that the ALJ failed to consider the impact of her obesity on her overall condition.   The ALJ noted that Flint had experienced weight gain, most likely associated with

hyperinsulinemia, but observed no significant symptoms or functional limitations as a result and concluded that the impairment was non-severe.  (Tr. 25-26).

The Social Security Administration will find that an individual with obesity meets the requirements of a listing if he or she has another impairment that, by itself or in combination with obesity, meets the requirements of a listing.  SOCIAL SECURITY RULING 02-01p (superseding Ruling 00-3p).  Obesity may increase the severity of coexisting or related impairments, especially musculoskeletal, respiratory, and cardiovascular impairments, to the extent that the combination of impairments meets the requirements of a listing. Obesity is also a relevant consideration during the later steps of the evaluation process because obesity can cause limitation of function and can affect a person's ability to sustain a function over time.  *Id*.  However, the Commissioner does not make any assumptions about the severity or functional effects of obesity combined with other impairments, and each case must be decided on its own record.  *Id*.

Flint does not contend that she meets any listed impairment when her obesity is taken into consideration, but she does complain of the ALJ's failure to address her obesity in assessing her RFC.  Although the ALJ did not address Flint's obesity throughout his decision, the court will not vacate an administrative decision unless the claimant's substantial rights have been affected.  *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).

Flint has presented no objective evidence regarding the effect of her weight on her ability to engage in work activities. The references to her weight in the record are generally stray remarks by physicians noting her weight or overweight appearance.  One of her treating physicians noted she was at risk for developing type II diabetes and recommended a diet and exercise program, but there

**Findings, Conclusions and Recommendation of**
**the United States Magistrate Judge–Page 15**

are no comments on the effect of her weight on her present medical condition.  Flint did not present

obesity as an impairment at the administrative level, and when given the opportunity, counsel did

not question the vocational expert about any functional restrictions allegedly caused by Flint's

weight. The ALJ assessed a RFC for sedentary work with a sit/stand option, and  Flint does not

identify any additional obesity-related restrictions that should have been included in this assessment.

Accordingly, she presents no basis for disturbing the Commissioner's decision.

      c.     Mental Impairments

Flint asserts that the ALJ failed to account for her memory and concentration deficits in

assessing her RFC.  Flint testified that one of the reasons she stopped working was her forgetfulness

and difficulty concentrating.  She has also been diagnosed with depression.

Mental limitations and restrictions must be accounted for in the RFC determination.  *See*

*generally* 20 C.F.R. § 404.1545(c).  Flint reported depression in some of her disability paperwork,

but when contacted by the case worker reviewing her application, expressly denied having any

mental or emotional problem interfering with her daily functioning.  (Tr. 60). Consistent with that

position, Flint's counsel did not take the opportunity at the hearing to question the vocational expert

about the work-related impact of any alleged mental impairments.  The ALJ also discredited Flint's

testimony that she has reduced concentration after observing that Flint had adequately completed

multiple forms during the disability application process without apparent loss of concentration.  (Tr.

28).

Flint has not shown that the ALJ's failure to incorporate memory or concentration deficits

in Flint's RFC is a result of legal error or a choice unsupported by substantial evidence.

**Findings, Conclusions and Recommendation of**
**the United States Magistrate Judge–Page 16**

d.       Treatment Side-effects

Flint asserts that the ALJ failed to consider the impact of the side-effects of her treatment regimen on her ability to work.  She testified that the medication she used for vertigo caused severe head pain, but she had not had the opportunity to talk with her doctor about this yet.  (Tr. 430).  Flint also indicated that some of her other medications cause nausea and drowsiness.[13]  (Tr. 94).

If an individual's medical treatment significantly interrupts the ability to perform a normal, eight-hour work day, then the ALJ must determine whether the effect of treatment precludes the claimant from engaging in gainful activity.  *Newton*, 209 F.3d at 459; *Epps v. Harris*, 624 F.2d 1267, 1273 (5th Cir. 1980).  And pursuant to Ruling 96-8p, the RFC assessment must be based on all of the relevant evidence in the case record, including the effects of treatment and the limitations or restrictions imposed by the mechanics of treatment, e.g., frequency of treatment, duration, disruption to routine, and side effects of the medication. SOCIAL SECURITY RULING 96-8p.

The ALJ did not expressly state that he was addressing the side-effects of treatment, but he considered Flint's subjective complaints of headaches, nausea, and fatigue.  (Tr. 28).  Overall, he found that her complaints suggested a greater degree of impairment than the objective evidence would support and were also inconsistent.  He noted that Flint testified that nausea affected her appetite, but she had maintained an excessive weight.  The ALJ also found that Flint had poor sleep habits that attributed to her need for naps during the day, as opposed to requiring rest for other

---

[13]   Flint suggests that attending physical therapy would also interfere with her ability to perform a full-time position.  Although Flint participated in formal physical therapy programs after shoulder surgery, Flint was no longer in physical therapy, nor is there any evidence in the record that additional physical therapy had been prescribed. Flint testified that she did exercises at home, but there is no indication that her home exercise program would interfere with a regular work schedule.

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge**–Page 17

reasons. (Tr. 28). He also found that Flint's pain was generally under control. Although Flint testified that she was having severe head pain with her vertigo medication, the onset of that problem was so recent that she had not had a chance to talk with her physician about it.

The ALJ adequately addressed Flint's complaints of side-effects in assessing her credibility and her RFC for a modified range of sedentary work.

    e.    Combination of Impairments

Flint complains that the ALJ violated the Commissioner's "combination principle," which requires the adjudicator to consider the combined effects of all of the individual's impairments throughout the disability determination process. More specifically, Flint contends that the ALJ failed to take into consideration the effects of her hyperparathyroidism, hyperaldosteronism, hyperinsulinemia, and osteopenia.

In assessing RFC, the adjudicator must consider the limitations and restrictions imposed by all of an individual's impairments, even those that are not considered severe. SOCIAL SECURITY RULING 96-8p. Flint complains that the ALJ gave inadequate attention to her diagnosis of osteopenia because it is a precursor to osteoporosis. Flint also asserts that her failing endocrine system (hyperparathyroidism, hyperaldosteronism, and hyperinsulinemia) causes a variety of symptoms, including fatigue, sluggishness, weight gain, and sleep difficulties, that are not accounted for in her RFC.

Although Flint argues that osteopenia is the precursor of a more severe disease, she does not allege that her osteopenia causes any specific work-related limitations that were omitted from the RFC assessment. The ALJ considered Flint's impaired endocrine system, but noted that she had no

**Findings, Conclusions and Recommendation of**
**the United States Magistrate Judge–Page 18**

significant problems despite elevated aldosterone and parathyroid levels.  (Tr. 26).  Flint also

testified that her thyroid function had improved with treatment and she no longer needed medication.

Additionally, the ALJ found that Flint had reported significant improvement in her pain and fatigue

with medication, (Tr. 27), and her Crohn's disease was in remission and she was well compensated,

which negated the theory that a malabsorption problem could be causing her fatigue.  (Tr. 28).  The

ALJ concluded that Flint's subjective complaints were exaggerated to the extent she claimed a

complete inability to perform any work activity.  (Tr. 29).

Flint has not demonstrated that the ALJ's assessment of her RFC is deficient as a product

of legal error or unsupported by substantial evidence.

2.      Closed Period of Disability

Flint contends that she was entitled to at least a sixteen month period of disability due to her

documented shoulder problems and related surgeries, and the declaration of her neurologist in

August 2001 that Flint was unable to work.

The ALJ acknowledged that Flint had required surgery on both shoulders, but she had

recovered from these procedures within twelve months of the onset of her symptoms.  (Tr. 27).  In

addition, the ALJ noted that Flint had not demonstrated signs of functional limitation in any joint

on a sustained basis.  (Tr. 27).  In addition, the neurologist's opinion that Flint is unable to work

addresses an issue reserved to the Commissioner and is not dispositive.  *See* 20 C.F.R. §

404.1527(e).  Although Flint was treated for a wide variety of conditions during the relevant time

period, the ALJ's determination that these conditions were not disabling in degree or for a sufficient

period of time is a reasonable view of Flint's medical history and has the support of substantial

**Findings, Conclusions and Recommendation of**
**the United States Magistrate Judge**–Page 19

evidence.

### 3.     Past Relevant Work

Flint asserts that the determination that her past relevant work as a data entry clerk is compatible with her current residual functional capacity (RFC) is not supported by substantial evidence.  Flint argues that, even if the ALJ correctly assessed her RFC, the testimony of the vocational expert does not support the ALJ's determination that the sedentary job of data entry clerk would allow her the option to sit or stand at will.

A sedentary job contemplates lifting no more than ten pounds at a time, sitting for about six hours during a standard eight-hour work day, and standing or walking for about two hours during the work day.  20 C.F.R. §§404.1567(a); SOCIAL SECURITY RULING 96-9p.  A worker who needs to alternate between sitting and standing does not precisely fit within the definition of sedentary work. *Scott v. Shalala*, 30 F.3d 33, 34 (Fifth Cir. 1984). SOCIAL SECURITY RULING 83-12. But there may still be work available at a sedentary level of exertion that does not require the worker to remain seated for extended periods. *See generally* SOCIAL SECURITY RULING 96-9p (discussing availability of work for claimant needing to alternate between sitting and standing or walking).

During Flint's administrative hearing, the vocational expert testified that Flint's previous work would provide the freedom to occasionally change positions from sitting to standing.  (Tr. 434).  The value of vocational experts is their familiarity with the specific requirements of particular occupations, including working conditions and the attributes or skills needed. *See Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986).   However, the value of the vocational expert's opinion is dependent on the presentation of a correct hypothetical.  The ALJ indicated in his written decision

that Flint needed work activity that could be performed in either a sitting or standing position at her option.  (Tr. 29).

When given their commonsense definitions, the ability to change positions "occasionally" is not sufficiently analogous to the ability to sit or stand at will as set out in Flint's RFC.  Social Security Ruling 96-9p directs that the RFC assessment be specific about the frequency of the individual's need to alternate between sitting and standing.  SOCIAL SECURITY RULING 96-9p.  And administrative failure to comply with a Social Security Ruling is grounds for reversal and remand when such failure occasions prejudice. *Hall v. Schweiker,* 660 F.2d 116, 118-19 (5th Cir.1981) (per curiam).  Because the ALJ did not accurately present Flint's RFC to the vocational expert, the vocational expert's testimony cannot constitute substantial evidence to support the ALJ's decision and the denial of Flint's application.  The ALJ's error warrants remand so that accurate vocational expert evidence can be obtained.

<u>RECOMMENDATION</u>

It is recommended that the decision of the Commissioner be reversed and remanded for further administrative proceedings consistent with these proposed findings of fact and conclusions of law.

NOTICE OF RIGHT TO OBJECT TO PROPOSED
FINDINGS, CONCLUSIONS AND RECOMMENDATION
AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within ten (10) days after the party has been served with a copy of this document.  The court is hereby extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation until June 30, 2005.  The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made.  *See* 28 U.S.C. § 636(b)(1).  Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

ORDER

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until June 30, 2005 to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation.  It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge–Page 22**

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED JUNE 9, 2005.

_____/s/ Charles Bleil_____
CHARLES BLEIL
UNITED STATES MAGISTRATE JUDGE